NORTHERN BANK OF NEW YORK et al. v. WASHINGTON SAV. BANK.

(Supreme Court, Appellate Division, First Department. April 14, 1916.)

ESTOPPEL ⊜⇒72—GROUNDS—INJURY TO ONE OF TWO BLAMELESS.

Where two insolvent banks claimed title to mortgages under assignments from a corporation secretly owned by the plaintiff bank, the title of the defendant bank, which had paid value in good faith, was as good as against the plaintiff bank, which was secretly concerned in the transactions which made the loss possible, and is now claiming under an assignment which was not delivered, to mortgages which it had never claimed or listed as assets; and hence, since a loss must come to some one, it should fall upon the depositors of the plaintiff bank, who made a loss possible, and not on the depositors of the defendant bank, which acted in good faith.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 188; Dec. Dig. ⊜⇒72.]

Appeal from Trial Term, New York County. ·

Action by the Northern Bank of New York and another against the Washington Savings Bank. From a judgment for the defendant, the plaintiffs appeal. Affirmed.

Argued before CLARKE, P. J., and McLAUGHLIN, DOWLING, SMITH, and DAVIS, JJ.

Henry H. Abbott, of New York City (George W. Morgan, William J. Quinn, and Edward A. Craighill, Jr., all of New York City, on the brief), for appellants.

Joseph A. Kellogg, of Glens Falls, for respondent.

DOWLING, J. This action was brought to secure the cancellation of four instruments of assignment executed by the Maclay Avenue Realty Company to defendant covering twenty-seven mortgages aggregating $69,923, on the ground that said assignments were fraudulently made and delivered without consideration. The answer of the defendant, after appropriate denials of the alleged facts on which plaintiff relied in order to recover, by way of counterclaim asked judgment that it be decreed to be the owner and entitled to the possession of the bonds and mortgages in question; that the same be brought into court and delivered to it; that a certain instrument dated July 6, 1909, purporting to assign to plaintiff bank certain of the mortgages in question be decreed fraudulent, null, and void, and be delivered up and destroyed; that it be adjudged to be entitled to the principal and interest collected on said mortgages and now held in a special account by the superintendent of banks; and that the same be paid over to it. Both of the banks in question are insolvent and in process of liquidation by the superintendent of banks, who also is in possession of the Realty Company, which is owned in its entirety by the Northern Bank and is an asset thereof. While taking no position as to merits of this controversy, the superintendent has authorized the taking of this appeal.

The Northern Bank, organized under the laws of the state of New York, was known as the Hamilton Bank prior to June 12, 1908. It

had a Riverside Branch and a Fourth Street Branch. Operating under its original name, it owned a mortgage for $135,000 on certain lands situated in the borough of the Bronx, city of New York. In February, 1908, a mechanic's lien on said property was foreclosed, and it was sold, subject to said mortgage, for the sum of $15,125 to Frederick K. Morris; the entire amount for the purchase being advanced by plaintiff bank. At the time of taking title Morris executed a declaration of trust in favor of the bank, which was not recorded. About March 2, 1908, plaintiff bank caused to be organized its coplaintiff, the Maclay Avenue Realty Company, with a capital stock of $1,000, divided into 100 shares of $10 each, which by the direction of the bank, and with its consent, was all issued to Frederick K. Morris, who continued to be the sole stockholder of record until September 12, 1912, after both banks had failed, when his certificate was surrendered and a new one issued in place thereof for the 100 shares of stock in the name of the plaintiff bank. The certificate issued to Morris had been indorsed by him in blank in the presence of plaintiff bank's president, and had for some time been in the possession of the bank, which allowed Morris to continue the sole stockholder of record. Meantime, on March 2, 1908, Morris had conveyed to the Realty Company 32 lots with unfinished houses thereon, in payment for which he had received $1,000 of stock in that company and a $50,000 purchase-money mortgage from the Realty Company, which he assigned at once to the bank. Thereafter the bank, which held a second mortgage for $25,000 and a lien for $15,000 on 30 vacant lots in the same block, subject to what is known as the Quackenbush mortgage for $25,000, bought in the lots at a foreclosure sale under the latter mortgage for $28,000. These lots were conveyed to the Realty Company in March, 1909. The bank also held a mortgage for $10,000 covering the beds of certain streets. It is claimed to have expended about $50,000 in completing the 32 houses, but its total investment in the Maclay avenue property, as testified to by the same witness, was only from $250,-000 to $253,000.

Title to these premises, it will be seen, was still in the Realty Company, which was the creation, instrument, and dummy of the bank, which owned all its capital stock and alone had advanced or paid out any money in the transactions. The bank now had mortgages of record against the property for $135,000, $50,000, and $10,000. It was desired to realize upon the property, so an auction sale was determined upon, which was to be held beginning April 17, 1909. Under the terms of sale, the purchasers thereat had the right to either pay part of the price in cash and the balance by a purchase-money mortgage, receiving a deed at once, or to enter into a contract for the purchase of the property, payment to be made in monthly installments. The option as to which of these courses the purchaser would follow expired on May 17, 1909. In order to be able to give good title from its dummy, the Realty Company, to the purchasers at the sale, it was necessary that the bank should satisfy of record its three mortgages of $135,000, $50,000, and $10,000 upon the tract, which it did; the instruments bearing date of May 13, 1909, and no consideration passing to the bank therefor. Meantime the transaction had occurred

which is the basis of this controversy. The Realty Company, as has been stated, was but a convenience for the Northern Bank. It held title to real estate which for reasons of its own the bank did not care to have appear in its list of assets. The Realty Company had no separate office of its own, nor was its name publicly displayed on any office door or building directory. It kept no books, had no printed stationery, and almost all its business was conducted on its behalf by the Bankers' Realty & Security Company, which collected sums due it, paid out money on its account, and made the appropriate entries on its own books.

The Bankers' Company was the fiscal agent of many of the corporations which Joseph G. Robin controlled or was interested in; whether his control was exercised through himself or others, it was absolute. He owned a majority of the stock of the Northern Bank; he was a director thereof for a part of the time in question, at all times a large stockholder therein, and from June 12, 1908, to the date of its closing, chairman of its executive committee. He was president and a trustee of the defendant Savings Bank. He was a director of the Bankers' Realty & Security Company, owning 960 out of 1,000 shares of its preferred stock and 450 out of 500 shares of its common stock. He seemed to encounter no opposition to his orders or expressed wishes in relation to any of these enterprises. The directors of the Realty Company were Frederick K. Morris, its president, and one Voetsch, a clerk in the office of the Northern Bank's attorneys. An effort was made to elect another such clerk a director, but it was not legally effectuated. Morris was known as a representative of Robin, who had a personal office in the Times Building with those of others of his enterprises; the only names appearing being those of the Bankers' Realty & Security Company and the Fidelity Development Company, a company engaged in the exploitation of the Morris Park tract. Morris was active in all the Robin companies. The Realty Company's presence in the building was only discoverable by reference to the elevator starter's book and it had no clerks or employés.

The defendant was a savings bank organized under the laws of this state. On April 17, 1909, the day of the holding of the first auction sale of the Maclay avenue property, or the preceding day, Morris, who was then president and sole stockholder of record of the Realty Company, had a talk with Lewis B. Freeman, assistant secretary of the defendant, about some mortgages coming to it on the Realty Company's property. On the date specified the defendant, at the request of Morris, gave him its check for $54,000, drawn to the order of L. A. Cheney, its secretary, who indorsed it over to the Bankers' Realty & Security Company at Morris' request and upon his statement that it was for mortgages. The stub of this check shows that it was given "for mortgage loan." No particular mortgages were referred to, but it is apparent that all the parties had in view mortgages which might hereafter be given by purchasers at the sale. This check, of course, never went into any separate bank account of the Realty Company, but into the account of the Bankers' Realty & Security Company, and its proceeds were used to meet a check of the latter company for $50,-

000 drawn the preceding day (April 16, 1909) to the order of Joseph G. Robin and by him indorsed to the order of the Carnegie Trust Company. The option given to the purchasers to decide what method of payment they would select having expired May 17, 1909, the appropriate documents to effectuate their choice were drawn by the attorneys for the plaintiff bank, at whose office title was to pass, and about June 12, 1909, Morris as president of the Realty Company received from them 26 bonds given by purchasers at the sale, the mortgage having apparently been sent for recording.

Contemporaneously he delivered these bonds to the defendant, and some time in the month of July the Realty Company executed an assignment by Morris, its president, attested by Voetsch, its secretary, sealed and duly acknowledged by Morris, dated May 17, 1909, to the defendant, of 14 of these mortgages aggregating $45,637. The assignment was dated back by Morris at Robin's direction. These mortgages covered lots sold at the sale of April 17th, and the assignment was recorded by the defendant on August 18, 1909. On June 26, 1909, the Realty Company by a like assignment assigned to the defendant the mortgage of one Tarbox in the sum of $4,000 given for land of the Realty Company sold through the Bankers' Company prior to the April sale. Under date of April 17, 1909, on the books of the Bankers' Company, the Realty Company was given credit for $49,000 received on its account from the defendant bank and for $637 in addition for "mortgages purchased from the former" (Realty Company) "and sold to the latter" (Savings Bank), thus equaling the total of the 15 mortgages assigned by these two assignments, viz. $49,637. About September 2, 1909, the Realty Company, by Morris, its president, by a like instrument, assigned to the defendant 8 more mortgages, aggregating $8,496, which were given by purchasers at the April sale, and delivered the assignment to defendant, which recorded it on December 31, 1909.

Up to this point defendant had assignments of bonds and mortgages aggregating $58,133; it had paid out originally $54,000, and on September 2, 1909, at the request of Morris, additional checks for $53,000, drawn on defendant, signed by its president and secretary, to the order of the secretary and indorsed by him, had been transmitted to Morris, who turned them over likewise to the Bankers' Realty & Security Company. On October 23, 1909, a second auction sale of property of the Realty Company was held, following which the Realty Company, by Morris, its president, assigned to the defendant four bonds and mortgages, aggregating $11,790, received from purchasers thereat, which assignment was recorded by defendant December 31, 1909. On November 18, 1909, a like entry was made in the books of the Bankers' Company giving credit to the Realty Company for an amount received from the defendant bank to equal the face of the 12 mortgages covered by the remaining two assignments, $20,142.46, being the present value of the mortgages less one-half of 1 per cent. The insurance policies on the premises in question, which had previously been payable to the Hamilton Bank as mortgagee, were transferred at different dates to defendant as mortgagee.

On January 24, 1910, the state superintendent of banks, through C. W. Hermans, examiner, made a detailed examination of the assets, liabilities, and general condition of the Washington Savings Bank. Among its assets he found bonds and mortgages aggregating $638,148, included among which he found and reported as the property of the bank the identical bonds and mortgages in question; the schedule annexed to the report setting them forth in detail. Similar examinations by the state superintendent of banks were made of the Northern Bank, on December 13, 1909, by W. W. Hutchins, examiner, and May 31, 1910, by A. C. Judson, examiner. On the former it owned bonds and mortgages aggregating $111,500; on the latter, $67,000. Not one of the mortgages in question appears listed as an asset of the Northern Bank. Thus, as far as any claim to these mortgages was openly made, it was advanced only by the Savings Bank, and the Northern Bank never sought to include any of them as part of its assets when the official examinations were made. The bonds and mortgages in question, having all been in the possession of the defendant bank, were taken therefrom some time in 1910 by Morris at Robin's direction, passed into Robin's custody, were returned to Morris, who kept them in a safe in his office, and afterwards put them in a safe deposit box in a vault under the Northern Bank in 125th street hired in his name, and kept the keys therefor till he sent them to the bank some time in December, 1910.

In the process of juggling with the assets of the corporation, an alleged assignment of those bonds and mortgages to the Northern Bank was executed by the Maclay Avenue Realty Company, by Morris, as president, attested by Voetsch, as secretary. The cover of the document bears date May 7, 1909; it is dated June 7, 1909, and acknowledged July 6, 1909; but it never was delivered to the bank, and seems to have remained in the possession of Morris until the day before the Northern Bank was closed. · This assignment never became legal or effective, nor, as we have seen, did the Northern Bank make any claim to the ownership of these mortgages thereunder. December 24, 1910, was the last day the Northern Bank was open for business. The superintendent of banks took possession of it on the 27th, and of the Washington Savings Bank on the 29th. On January 11, 1911, a petition in bankruptcy was filed against the Bankers' Realty & Security Company.

The present action arises from the desire to save for the depositors of the various institutions as much as possible out of the general wreck. Without going at further length into the details of the testimony, it sufficiently appears that the Bankers' Realty & Security Company was the duly authorized agent of the Maclay Avenue Realty Company, receiving payment for mortgages and contracts on the account of the latter company, selling its real estate and mortgages, receiving payment thereon, and giving credit therefor on its (the Bankers' Company's) books to the Realty Company, which accepted the same as payment. This course was followed, as the Bankers' Company was the financial agent of so many of Robin's enterprises, including the Northern Bank and the Realty Company, and was a sort of clearing

house for their transactions. The defendant parted with full value for the bonds and mortgages assigned to it, and the money went to the Realty Company's authorized agent, which it and its owner, the Northern Bank, had clothed with full and complete power to act for and on its behalf.

The Northern Bank parted with nothing for its alleged assignment, and its act in discharging of record the mortgages held by it against the Realty Company's property was to enable title to be given to purchasers and to effectuate its own purposes in causing the auction sales to be held. If loss has occurred to the Northern Bank in any way, it is due to its own manner of doing business and to the method in which it manipulated its dummy, the Realty Company, and its financial agent, the Bankers' Company. The assignments to the defendant were executed by Morris, as president of the Realty Company, and attested by Voetsch, as its secretary, and these two were its only directors, while Morris was its only stockholder and acknowledged the instrument, deposing to his authority to execute it and to the order of the board of directors to that effect. The defendant alone claimed ownership of the bonds and mortgages after the assignments to it and listed them among its lawful assets. Plaintiffs never moved to assert ownership until after the failure of all the institutions involved.

The relations between all the corporations involved were intimate. Their domination by Robin was complete; the authority given to Morris and the Bankers' Company to deal with the affairs of the Realty Company, the creature of the Northern Bank, was open and avowed, and, if exercised at times in a way which was informal, it never questioned or repudiated. The Northern Bank allowed Morris to remain the sole stockholder of record of the Realty Company and to manage its affairs with but one other director, a clerk in a lawyer's office and who could have but a nominal connection with its business. The defendant in good faith advanced its moneys on the security of bonds and mortgages which it was to receive from the Realty Company, and which it did in fact receive. The Northern Bank was responsible for the course of conduct by the Realty Company and its agent which led to the situation now under examination. In view of all these considerations, since a loss must come to some party, it should come to those who created the situation which made a loss possible, and not to the one which alone acted in good faith.

The judgment appealed from is therefore affirmed, with costs. All concur.